# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:

| | |
|---|---|
| Julie O. Waterman | Case No. 10-01849-als7 |
| Debtor | Chapter 7 |
| Julie O. Waterman | Adv. Pro. 10-30073-als |
| Plaintiff | |
| v. | |
| United States of America (IRS) | |
| Defendant | |

**MEMORANDUM OF DECISION**
**(date entered on docket: June 15, 2012)**

Julie Waterman ("Plaintiff" or "Waterman") filed a chapter 7 bankruptcy case on April 13, 2010. She seeks discharge of her 2002 federal income tax obligation under this adversary proceeding filed on May 7, 2010. Trial on this issue was conducted on December 13 and 14, 2011. The Plaintiff was represented by Jerrold Wanek.[1] The Internal Revenue Service appeared by its counsel, LaQuita Taylor-Phillips. Upon the filing of the post-trial briefs, the matter was fully submitted. The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. sections 157(b)(1) and 1334. The following findings of fact and conclusions of law are entered by the Court pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. For the reasons set forth herein the Plaintiff's 2002 federal tax debt is discharged.

---

[1] On February 9, 2012, a document filed in this proceeding at docket number 25 notified the Court and the parties that Jerrold Wanek had died on January 25, 2012. James R. Monroe entered an appearance for the Plaintiff and filed the post-trial brief on her behalf.

1

FACTS

While working at a dental office, Waterman met Dr. Robert Weissinger ("Weissinger") who was employed at a medical clinic in the same complex. The two were married on February 8, 2002. The Plaintiff's minor daughter, from a previous marriage, lived with them part-time. Waterman neither received, nor expected, any child support from her ex-husband.

In 2001, Waterman Consulting (WC) was established at Weissinger's suggestion. This company was solely owned and operated by the Plaintiff, and its only purpose was to provide a vehicle through which marketing services would be performed for Robert Weissinger, P.C., (involving contract medical services) and Doc. Bob, Inc. (regarding a poison ivy treatment called Rash Pro).[2] No discussion, agreement, or understanding existed as to the amount that would be paid for services rendered by WC. Limited services, in the form of demographic research on a potential medical clinic, were provided to Robert Weissiner, P.C. Substantial work was provided by WC related to marketing plans, labeling and vendor placement for Rash Pro. A 1099 tax form reported payment of $121,794 to WC from Robert Weissinger, P.C. for calendar year 2002. The Plaintiff withdrew these funds from WC and deposited them in a joint checking account held with Weissinger. This account was used to pay regular household expenses and to make a down payment on a new residence.

The Plaintiff's 2002 federal income tax return, prepared by her husband's accountant, reflected taxes owing in the amount of $47,832. This amount was not paid at the time the return was filed. Payment and collection efforts then followed. An Offer in Compromise ("OIC") was submitted in October 2003 and rejected on March 4, 2004. There is no explanation as to why this OIC was declined. The Plaintiff states she did not understand this process and that this

---

[2] Weissinger testified that at one time Waterman had an interest in Doc Bob, Inc. No documentation was presented to clarify its corporate ownership.

action was undertaken on her behalf by Weissinger. In May 2004, a Notice of Intent to Levy was sent by the IRS to Waterman as a result of the rejected OIC.[3] The next communication from the IRS did not occur until October 9, 2006 and was identified as a reminder that the 2002 taxes remained unpaid in the total amount of $74,695.68.

After this last notice was received, the marriage between Waterman and Weissinger became strained due, in part, to financial issues and the tax obligation. A second mortgage which the Plaintiff executed in July 2006 in the amount of $35,677 was utilized to resolve Weissinger's personal tax liability, although the Plaintiff mistakenly believed it was to be used to resolve her tax debt. Waterman claims that during this time period, Weissinger controlled the couple's finances and that he only deposited funds into their joint account that he believed were sufficient to cover necessary household expenses, and as their relationship deteriorated he apparently refused to cover expenses for Waterman's daughter. The Plaintiff returned to work in 2006 to earn money to supplement the funds in the joint household account to cover her additional expenses. During this same calendar year, net proceeds from a lawsuit in the amount of $3,000 are identified as other income to Waterman. She received $1,000 of this total amount with the remainder being paid to Weissinger for reimbursement of legal fees. During this time, the friction between the couple increased related to the 2002 tax obligation. In January 2007 an installment payment plan was arranged with the IRS. The Plaintiff claims she was not involved in establishing this agreement. Rather, it appears that Weissiner directed a third party to contact the IRS to coordinate this payment plan. Waterman later learned that during this same time, an installment payment plan was in place between Weissinger and the IRS related to his outstanding tax obligations. She believed that payments to the taxing authority reflected in their joint

---

[3] This Notice was not provided in the exhibits and is based upon the information contained in the tax transcript. Before this levy was issued, the tax transcript also indicates that the outstanding tax obligation is uncollectible and the tax period was blocked from the automatic levy process.

checking account were being applied to her tax liability. This conclusion was misplaced. Approximately seventeen months passed, and after receiving only two payments, the IRS noted on the Plaintiff's tax transcript that her installment plan was in default. Weissinger readily admits that when he and Waterman formally separated he discontinued making any payments on her tax liability.

Weissinger and Waterman were divorced on July 11, 2008. The divorce decree and stipulation between the parties provided for a division of property. The Plaintiff received all personal property, clothing and jewelry in her possession at the time of the divorce and was specifically awarded a 1965 Mercedes Benz automobile and the amount of $138,000 under a Qualified Domestic Relations Order (QDRO) related to Weissinger's retirement plan through Fidelity Investments. She was also permitted to use a vehicle awarded to Weissinger until she was able to purchase a replacement automobile. The decree specifically stated that Waterman was responsible for payment of her tax liability.

The Plaintiff's ability to access the funds awarded to her under the QDRO was delayed, and during the delay, the value of the funds decreased. In the Fall of 2008 she received income of $109,318, which after withholding of taxes resulted in net funds paid to her in the amount of $81,988. These funds were placed into Waterman's checking account at West Bank. Thereafter, she made a cash withdrawal in the amount of $10,000. The disposition of these funds is not detailed in the record.

In January 2009, Waterman's tax file was assigned to Revenue Officer Jocelyn Asada ("Officer Asada"). Upon her review, she contacted Luis Verra of American Tax, named on a Power of Attorney ("POA"). No response was received from this entity. Later that same month, Officer Asada unsuccessfully attempted to contact the Plaintiff to discuss the outstanding tax

4

liability. On April 2, 2009, attorney Ron Mountsier submitted a POA to the IRS on behalf of Waterman. He was working on an OIC and an agreed deadline for its submission was set for May 9, 2009. The OIC was not received by the IRS until June 1, 2009. In the interim time period the IRS issued a levy on the Plaintiff's West Bank account which resulted in funds being paid on her outstanding tax liabilities. The OIC was eventually withdrawn in February 2010. Being unable to resolve her issues with the IRS through negotiation, and at the suggestion of her tax attorney, Waterman consulted a bankruptcy lawyer related to her remaining tax liability, which resulted in her chapter 7 filing and this adversary proceeding.

## DISCUSSION

A Chapter 7 discharge may apply to alleviate pre-petition tax obligations if certain conditions are met under 11 U.S.C. sections 523(a)(1)(A) and (B) which provide that tax obligations are subject to discharge if owing from a return that: was due more than three years prior to the bankruptcy filing, was filed more than two years prior to the bankruptcy filing; and arises from a tax assessed earlier than 240 days prior to the bankruptcy filing. See 11 U.S.C. § 523(a)(1)(A) and (B) (2010). The Plaintiff has met her initial burden to qualify her 2002 tax debt for discharge under these sections. The IRS argues that the tax liability is not discharged by virtue of the affirmative defense contained at 11 U.S.C. section 523(a)(1)(C) which precludes discharge of a tax obligation if a debtor "made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."[4] 11 U.S.C. § 523(a)(1)(C) (2010). To be successful, the IRS must prove by a preponderance of the evidence, both the Plaintiff's conduct (that she sought "in any manner to evade or defeat" her tax liability) and intent (that she did so "willfully"). Grogan v. Garner, 498 U.S. 279, 291 (1991); Fliss v. Iowa Dep't of Revenue (In re Fliss), 339

---

[4] There is no allegation by the Defendant, nor any evidence to support that the 2002 return filed by Wateman was fraudulent, rendering that factor irrelevant to the outcome of this proceeding.

5

B.R. 481, 488 (Bankr. N.D. Iowa 2006). Evidence on these elements will be "viewed consistent with the congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally for the debtor." In re Roper, 286 B.R. 693, 701 (Bankr. E.D. Ark. 2002).

In this Circuit: "[i]f a debtor is aware of the duty to pay his taxes, has the wherewithal to pay the taxes and takes steps to avoid paying them, there is a willful attempt to evade or defeat the tax." May v. Mo. Dep't of Revenue (In re May), 251 B.R. 714, 718 (B.A.P. 8th Cir. 2000), aff'd, 2 Fed. Appx. 681 (8th Cir. 2001). Each of these considerations will be addressed separately.

### A. Awareness and duty to pay taxes

Various reasons are recited by Waterman as to why she was unable to make, or did not believe she was responsible for making, payment of the 2002 taxes during the period of her marriage to Weissinger. First, WC operated for only a short time and for a limited purpose. Plaintiff states that Weissinger promised that he would pay her tax obligation. At trial, she contends that the primary motivation for the payment to WC was Weissinger's effort to reduce any potential profit or income realized by his professional corporation in order to preclude his ex-spouse from making a claim for increased child support. Weissinger denies this intent, but his explanations are self-serving and in some instances inconsistent. A lack of concern or attention to detail is apparent in his failure to pay his own taxes and the manner in which he handled payment of his business expenses. Based upon the record, the Plaintiff's explanation is plausible. Second, Waterman states that she has been an employee during the majority of her working life and acknowledges a lack of awareness and understanding of business operations, self-employment taxes and the handling of such obligations. The Plaintiff has always relied

6

upon professionals to prepare and file her taxes, and during her marriage this practice continued with the use of her husband's accounting firm.

Notwithstanding these explanations, the following facts are uncontroverted. The Plaintiff does not deny her responsibility to pay taxes. Her 2002 tax obligation was the subject of frequent discussion with Weissinger. The divorce decree clearly states that the Plaintiff is solely liable for her 2002 tax debt. Attempts to address the tax liability were undertaken both during and after the parties' marriage. Formal notices and informal contacts were delivered or initiated by the IRS to address the outstanding taxes. Waterman affirmatively sought legal advice to resolve her tax liability prior to filing bankruptcy. All of these circumstances indicate that the Plaintiff was aware of her duty and responsibility to pay the 2002 tax obligation.

### B. Ability to pay taxes

The following income information is contained on the Plaintiff's federal tax returns during the relevant time periods.

| Tax Year | Wages | Business Income | Other Income |
|---|---|---|---|
| 2002 | $15,998 | $121,794 | $2,563 |
| 2003 | $5,639 | $0.00 | $0.00 |
| 2004 | $5,859 | $0.00 | $0.00 |
| 2005 | $14,338 | $0.00 | $0.00 |
| 2006 | $32,637 | $0.00 | $3,000 |
| 2007 | $18,927 | $0.00 | $18,000 |
| 2008 | $24,423 | $0.00 | $384 $109,318 |
| 2009 | $46,236 | $0.00 | $386 |

7

In response to the position of the IRS that she had the wherewithal to pay her taxes, the Plaintiff argues that based upon her income she was never in a position to pay the tax obligation. This is clearly true in tax years 2003, 2004, and 2005. The OIC submitted in June 2009 was rejected by a preliminary response from the IRS dated November 2009.[5] It outlines cash assets of approximately $15,000 and income in the amount of approximately $45,000 in reaching a proposed settlement amount of not less than $60,750.64. This information was not explored at trial by either party. The IRS may have included funds on deposit at West Bank[6] and all anticipated income for a full calendar year. If that is the case, it is not clear how Waterman could be expected to make a lump sum payment under an OIC in the amount suggested by the IRS and still meet her necessary living expenses.

The IRS's argument focuses upon the Plaintiff's ability to make more frugal spending choices in order to enable payment of her 2002 taxes. This viewpoint is problematic because this bare assertion is not accompanied by any expense guidelines which the IRS believes would be more reasonable or appropriate under the specific circumstances of this case. The more persuasive argument is found in the Plaintiff's analysis, which utilizes the national standards for living expenses that are promulgated by the IRS and consistently applied for the purposes of evaluating whether income is available for tax payment or compromise. According to estimates of her monthly income, based upon annual salary amounts, Waterman demonstrates minimal disposable income, if not a negative cash flow, under the IRS guidelines. Based upon this information, the Plaintiff has not had, and does not currently have the wherewithal to pay the 2002 tax obligation

---

[5] Defendant's Exhibit O.
[6] Which were subject to a successful levy in the amount of $12,646.69 six months prior to the date of the response. No other substantial assets have been identified as owned or available to the Plaintiff during this time frame.

**C. Takes steps to avoid paying taxes**

This final consideration is the crux of the Defendant's case. The IRS contends that the Plaintiff has had the means to pay her taxes and instead decided to go on a "spending spree" that included purchasing a car, clothing and spa services, dining in restaurants, and assisting her daughter with college expenses. Waterman counters that she did not engage in the type of conduct required by the statute to prevent discharge of her 2002 tax debt.

A number of factors are useful in evaluating whether there has been a willful evasion of taxes under the statute. These areas of inquiry include, but are not limited to the: failure to file tax returns; filing of late returns; failure to file adequate returns; failure to make tax payments; failure to maintain usual records to document transactions; dealing in cash; frustration of collection efforts; implausible or inconsistent behavior by the taxpayer; and election to divert substantial income to uses other than paying lawful taxes.[7]

Utilizing these factors, a number of cases have held that outstanding tax obligations are not subject to discharge. See United States v. Mitchell (In re Mitchell), 633 F.3d 1319 (11th Cir. 2011) (discretionary spending on timeshare properties, stock purchases, and making substantial personal loans prevents discharge of taxes); Stamper v. United States (In re Gardner), 360 F.3d 551 (6th Cir. 2004) (could not discharge taxes when debtor took twenty golf trips and vacations rather than make any tax payments); Griffith v. United States (In re Griffith), 206 F.3d 1389 (11th Cir. 2000) (taxes not subject to discharge where debtor engaged in fraudulent transfer of

---

[7] See United States v. Mitchell (In re Mitchell), 633 F.3d 1319, 1326-30 (11th Cir. 2011); United States v. Fretz (In re Fretz), 244 F.3d 1323, 1329 (11th Cir. 2001); United States v. Fegeley (In re Fegeley), 118 F.3d 979, 984 (3d. Cir. 1997); May v. Mo. Dep't of Revenue (In re May), 251 B.R. 714, 718 (B.A.P. 8th Cir. 2000), aff'd, 2 Fed. Appx. 681 (8th Cir. 2001); United States v. Beninati 438 B.R 755, 758 (D. Mass. 2010); Hassan v. United States, (In re Hassan), 301 B.R. 614, 622 (S.D. Fla. 2003); United States v. Spiwak (In re Spiwak), 285 B.R. 744, 751 (S.D. Fla. 2002); Hamm v. United States (In re Hamm), 356 B.R. 263, 285-86 (Bankr. S.D. Fla. 2006); Fliss v. Iowa Dep't of Rev. (In re Fliss), 339 B.R. 481, 486-87 (Bankr. N.D. Iowa 2006); Mills v. United States (In re Mills), 337 B.R. 691, 700 (Bankr. D. Kan. 2005); Hamer v. IRS (In re Hamer), 328 B.R. 825, 834 (Bankr. N.D. Ala. 2005); United States v. Carey (In re Carey), 326 B.R. 816, 823-24 (Bankr. E.D. Cal. 2005); United States v. Ryan (In re Ryan), 286 B.R. 141, 148 (Bankr. W.D. Mo. 2002).

9

assets to his wife to prevent collection efforts by taxing authority); Geiger v. IRS (In re Geiger), 408 B.R. 788 (C.D. Ill. 2009) (taxes not discharged where failure to file and pay taxes were coupled with unexplained and extravagant spending in the amount of $500,000); United States v. Jacobs (In re Jacobs), No. 305CV252J99HES, 03-07148BKC3P7, 04-00045, 2006 WL 2691516 (M.D. Fla. Sept. 19, 2006) (due to debtor's numerous intra-family/business transfers, expenditures for club memberships and dues, cosmetic surgery, vehicle leases and large charitable donations, along with a consistent failure to accurately report and pay taxes, taxes were not discharged); Landi v. United States (In re Landi), 316 B.R. 363 (M.D. Fla. 2004) (no discharge for taxes due to debtor's use of corporation for payment of personal expenses in order to avoid tax levy); Hawkins v. Franchise Tax Bd. (In re Hawkins), 430 B.R. 225 (Bankr. N.D. Cal. 2010) (husband's tax liability not discharged due to conduct undertaken to evade and avoid tax payment); United States v. Mixon (In re Mixon),Bankr. No. 05-86866-BJH-7, Adv. No. 07-3257, 2008 WL 2065895 (Bankr. N.D. Tex. May 13, 2008) (taxes not discharged because debtors utilized their business to pay for substantial personal expenditures in an effort to frustrate tax collection efforts); Volpe v. IRS (In re Volpe), 377 B.R. 579 (Bankr. N.D. Ohio 2007) (intra family real estate transaction and using available funds for leisure activities and private school tuition for minor children resulted in finding that taxes were not subject to discharge); Claxton v. United States (In re Claxton), 335 B.R. 680 (Bankr. N.D. Ill. 2006) (not making any tax payment coupled with consistently failing to file personal and business tax returns prevented discharge of tax liability); Mathis v. United States (In re Mathis), 310 B.R. 468 (Bankr. S.D. Fla. 2004) (combined failure to file tax returns and make tax payments prevented discharge of taxes). The majority of these cases involve lavish spending coupled with additional acts to evade taxes.

The IRS cites to In re Lynch, for the proposition that Plaintiff's tax debt does not qualify for discharge because she made substantial discretionary purchases in lieu of making payment on outstanding tax obligations. See Lynch v. United States (In re Lynch), 299 B.R. 62 (Bankr. S.D.N.Y. 2003). In Lynch, the debtor owed almost $600,000 in taxes, had many years of very high income, and filed several extremely late tax returns. Id. at 68-69. In addition, while knowing about her tax liability, the debtor paid between $5,200 and $6,900 per month for rent, made extremely high charitable contributions (between $15,989 and $17,624 per year), took many extravagant vacations (including trips to Paris and China), spent $11,000 per year on restaurant meals, spent $18,000 per year on food and holistic supplements, and spent $9,276 per year for transportation (the court noted that this was very high for New York City). Id. at 72-75. Furthermore, the debtor took an affirmative act to evade the payment of taxes by canceling the direct deposit of her paycheck. Id. at 76. The court in Lynch held that in light of the debtor's circumstances, she could have paid her taxes but instead chose to make excessive discretionary expenditures and therefore, her taxes were not discharged. Id. at 84-85.

The Defendant argues that the holding in Lynch applies to the Plaintiff's conduct based upon a theory that Plaintiff's expenditures compared to her total income results in a mathematical percentage that is similar to Lynch's spending pattern. In its case, the IRS relies upon a series of expenditures totaling $77,407 during the time period of September 2008 through April 12, 2010. The Defendant characterizes this spending by Waterman as excessive, and therefore, evidence of conduct to avoid tax payments. The identified transactions and amounts are:

11

| Expense Category | Total Amount |
|---|---|
| Travel Expenses/ Cruise | $7,203 |
| Cash Withdrawal | $10,0000 |
| Loan to Friend | $2,000 |
| Automobile | $14,443 |
| Upgrade on Automobile purchase | $2,100 |
| Personal Care Services/Fitness | $4,768 |
| Kansas City Trip | $1,974 |
| Restaurant Dining | $10,503 |
| Groceries | $10,059 |
| Clothing | $14,358 |

The Court excludes from consideration the following items from the spending summaries submitted by the IRS for the reasons stated: (1) the loan to a friend in the amount of $2,000 (which was repaid prior to bankruptcy filing); (2) the automobile (which was purchased to provide economical and reliable transportation after Weissinger and Waterman's divorce)[8]; (3) the grocery category (which includes local stores that sell not only food, but also gas); and the clothing expenses (which were satisfactorily explained based upon health issues and the Plaintiff's employment). No evidence was presented to establish that these expenditures were excessive or extraordinary.[9] The Court concludes that these expenses were both reasonable and

---

[8] The Court does not view as unreasonable either the original purchase price or the upgrade utilized in conjunction with insurance proceeds. Further, the transportation ownership costs allowed under the national standards would appear to provide for a vehicle within this price range.
[9] Plaintiff's total expenditures for groceries, vehicle operation, clothing and restaurant dining exceed the National Standards by approximately $7,000 over the relevant 19 month time period.

Case 10-30073-als Doc 39 Filed 06/15/12 Entered 06/15/12 15:26:06 Desc Main
Document Page 13 of 15

necessary. Having disposed of these entries from consideration under the IRS's argument, the Court now turns to the remaining identified expenditures.

The cost incurred for a cruise is clearly unnecessary and lavish in its amount, especially when there is a substantial outstanding tax debt, but the Plaintiff canceled this trip and received a refund of the amount paid.[10] She then utilized these funds to assist her daughter with college expenses. Based upon historical information of the relationship and responsibilities involving her daughter, such financial assistance by Waterman was common. Under the circumstances of a relative's deployment to Afghanistan and a family gathering, the Court does not conclude that the Kansas City trip represents a substantial diversion of income that would qualify for excepting the tax debt from discharge.

The remaining items involve expenses for restaurant dining and personal care that the IRS describes as spa treatments and pampering. Many of these costs arise from a perceived need or want for both the Plaintiff and her daughter. Waterman's explanations for this spending were candid, and in some instances were business related. She admits that she may not have made the best decisions after her divorce from Weissinger. While such activity is not condoned in light of substantial tax debt, based upon the indivdiual amounts of the transactions identified, the Court cannot conclude that Waterman engaged in this spending in an effort to "divert substantial income" to avoid payment of her tax obligation. In comparison to the expenditures

---

[10] The trial record discusses in detail two instances of spending related to travel. One is a trip to Kansas City and the other is a cruise. The evidence is not clear related to the total amounts incurred for the cruise expense. A review of the relevant bank account records reflect seven items dated November 26, 2008. Based upon the description and timing of these debits it is inferred that this total of $6,122.68 is related to the purchase of a cruise. There are two subsequent expenditures in the amounts of $142.00 and $64.00 that also appear to be cruise related. (Summary Exhibit 179). The uncontroverted testimony related to the cruise is that it was canceled and a refund was obtained by the Plaintiff. To the extent any refund(s) were deposited into the West Bank account and then utilized for other expenditures, the total amount of Plaintiff's overall spending may be inflated under the Defendant's spending summaries.

and income diversion described in the cited opinions, the Plaintiff's discretionary expenditures can be construed as reasonable and modest.

The Defendant, through its case, appears to suggest that Waterman's failure to use the funds received under the QDRO to pay off her tax obligation constitutes willful conduct to avoid payment of her taxes. Whether the Weissingers specifically discussed the 2002 tax obligation and the Fidelity Funds at the time they reached an agreed settlement of their divorce is not clearly established in the record. The divorce decree is silent as to the required use of those funds. Whether the QDRO was paid to equalize the division of property between the parties or was in fact made in satisfaction of a promise to pay the taxes is not clear from the record. Due to the disparity in the parties' income, the assets retained by Dr. Weissinger, and the Plaintiff's need to obtain household goods and pay ongoing living expenses, it is plausible to conclude that this payment could have been awarded for reasons other than to satisfy the 2002 tax debt. Mere failure to pay an outstanding tax debt does not establish the kind of conduct necessary to except a tax obligation from discharge. See In re Haas, 48 F.3d 1153 (11th Cir. 1995) (abrogated in part by Griffith v. United States, (In re Griffith), 206 F.3d 1389, 1395-96 (11th Cir. 2000) (court reaffirmed ruling that failure to pay taxes alone does not satisfy the conduct requirement).

Cases of this nature are factually intense and the totality of the circumstances related to the Plaintiff's conduct is relevant. See Kight v. Dep't of Treasury (In re Kight), 460 B.R. 555, 562-63 (Bankr. M.D. Fla. 2011); Roper v. Barclay (In re Roper), 286 B.R. 693, 703 (Bankr. E.D. Ark. 2002), aff'd, 294 B.R. 301 (B.A.P. 8th Cir. 2003). Upon review of the evidence, the Court finds Waterman's explanations and testimony credible. See Lindros v. United States (In re Lindros), 459 B.R. 842, 848 (Bankr. M.D. Fla. 2011) (case ultimately came down to whether the debtor was a credible witness). While there is no minimum or maximum number of factors or

14

badges of fraud that must be met to bar discharge of a tax debt, "[i]n the more typical case in which [a] court relies upon luxury expenditures, there are other indices of evasion that are not present here . . . ." See Hawkins v. Franchise Tax Bd., 430 B.R. at 241. Applying the relevant legal standards outlined here, and based upon the record, the IRS has failed to carry its burden to show that the Plaintiff's 2002 taxes should be excepted from discharge under 11 U.S.C. section 523(a)(1)(C).

For the reasons set forth herein

IT IS ORDERED:

(1) The Plaintiff's 2002 tax obligation is discharged;

(2) Judgment shall enter accordingly; and

(3) The parties shall bear their own costs.


/s/ Anita L. Shodeen
Anita L. Shodeen
U.S. Bankruptcy Judge


Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Adversary Proceeding